```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                      CASE NO. 0:16-CR-60227


 3

     UNITED STATES OF AMERICA
 4                                   Miami, Florida
                                     May 10, 2017
 5          vs.                      Wednesday


 6
     MANUEL PEREZ GONZALEZ           Scheduled 10:00 a.m.
 7                                   10:13 a.m. to 11:20 a.m.


 8                                   Pages 1 - 44
     -------------------------------------------------------------
 9

10                        RESTITUTION HEARING


11

            BEFORE THE HONORABLE ALICIA M. OTAZO-REYES
12                 UNITED STATES MAGISTRATE JUDGE


13

     APPEARANCES:
14
     FOR THE GOVERNMENT:       JONATHAN KOBRINSKI, AUSA
15                             Assistant U.S. Attorney's Office
                               99 Northeast 4th Street
16                             Miami, Florida 33132-2111


17
     FOR THE DEFENDANT:        STEFANIE C. MOON, ESQ.
18                             1408 South Andrews Avenue
                               Fort Lauderdale, Florida 33316

19

20   STENOGRAPHICALLY
     REPORTED BY:              GLENDA M. POWERS, RPR, CRR, FPR
21                             Official Court Reporter
                               United States District Court
22                             400 North Miami Avenue, Room 08S33
                               Miami, Florida 33128
23

24

25
```

```
 1              (Call to the order of the Court:)

 2              (Defendant Perez Gonzalez Aided By Court-Certified

 3     Spanish Interpreters.)

 4              COURTROOM DEPUTY:  All rise.  In the United States

 5     District Court in and for the Southern District of Florida; the

 6     Honorable Alicia M. Otazo-Reyes presiding.

 7              THE COURT:  Good morning, everyone.

 8              MR. KOBRINSKI:  Good morning.

 9              THE COURT:  The United States of America versus Manuel

10     Perez Gonzalez, Case Number 16-20187-Criminal-Ungaro.

11              Counsel, please state your appearances for the record.

12              MR. KOBRINSKI:  Good morning, Your Honor.

13              Jonathan Kobrinski on behalf of the United States, and

14     with me at the table is Co-Case Agent Chinelle Medina from

15     Homeland Security Investigations.

16              THE COURT:  All right.

17              MS. MOON:  Good morning, Your Honor.

18              Stephanie Moon on behalf of Mr. Perez Gonzalez, who is

19     standing with me at counsel table with the aid of the

20     interpreter.

21              THE COURT:  All right.  Thank you very much.  All

22     right.  So we're here for this restitution hearing that Judge

23     Ungaro referred to me.  They sent to me these materials, briefs

24     in support of restitution claim and a number of exhibits.

25              There seems to be some indication, Ms. Moon, that these
```

1    materials have been provided to you; is that correct?

2            MS. MOON:  That is correct, Your Honor.

3            THE COURT:  All right.  And I see from the brief that

4    there are what are called "Paroline factors" to aid in the

5    determination of whether restitution should be imposed and what

6    amount.

7            So, Mr. Kobrinski, are you ready to proceed?

8            MR. KOBRINSKI:  Yes, Your Honor.  I think just to

9    assist the Court in a full understanding -- because one of the

10   things that Paroline directs the Court to do is to understand

11   the defendant's causal connection to the harm that the victim

12   suffered.

13           And just to be clear, restitution in this case is

14   mandatory.  He's convicted of a child pornography offense.

15   He's convicted of distribution, receipt and possession of child

16   pornography, and so I could proffer -- it's brief testimony --

17   to just establish where the videos were located and this all, I

18   believe, came out during the course of the trial.  I could

19   proffer it or, alternatively, we have the Special Agent here.

20           I don't know how Ms. Moon would prefer to proceed.

21           THE COURT:  Ms. Moon.

22           MS. MOON:  Quite frankly, it's not our burden,

23   Your Honor.  It's up to the Government as to how they'd like to

24   proceed.

25           THE COURT:  Well, I understand, but if you make some

1   stipulation, then that would go towards expediting the matter.

2   We're not asking you to present anything, just to tell us what

3   your position is.

4        MS. MOON:  I understand, Your Honor.

5        If Your Honor will recall, Mr. Perez Gonzalez, in my

6   initial appointment and in the several hearings that we've had

7   before Your Honor, Mr. Perez Gonzalez does not consent to

8   stipulating to anything.

9        MR. KOBRINSKI:  Well, Your Honor, perhaps I should

10  proffer the --

11       THE COURT:  All right.  I got it.  No problem.

12       MR. KOBRINSKI:  -- proffer the facts and then

13  Ms. Medina will be available for cross-examination of

14  Ms. Moon.

15       THE COURT:  Are you available to proceed in that

16  fashion with a cross-examination?

17       I don't want to put you on the spot, Ms. Moon.

18       MS. MOON:  All I can tell you is what he has told me,

19  Your Honor, he does not agree to stipulating to anything.

20       THE COURT:  You do not agree to anything.

21       MS. MOON:  The Government must make its burden.

22       THE COURT:  All right.  I am ordering the Government to

23  proceed by proffer, and then you are free to cross-examine the

24  witness.

25       MR. KOBRINSKI:  Thank you, Your Honor.  So --

1          THE COURT:  And this proffer is towards the causal

2     connection?

3          MR. KOBRINSKI:  Yes, Your Honor.  There's only been one

4     victim of the numerous videos and files that Mr. Perez Gonzalez

5     possessed -- there's only been one victim who submitted a

6     restitution request, and that victim has been referred to in

7     the files that he possessed and also in restitution request as

8     "Vicky."

9          This individual is a known victim to law enforcement.

10    In fact, one of the law enforcement officers who rescued her

11    testified at the trial, and that's in part because the CD that

12    Mr. Perez Gonzalez possessed -- which otherwise there wasn't an

13    interstate nexus to necessarily establish -- this agent -- her

14    images and two of her videos were on that CD.  He possessed it.

15         It was a backup of a previous computer that he had, and

16    these two files were on the video and the agent reviewed them

17    and recognized that they were Vicky, the individual who he

18    rescued in another state that wasn't Florida.  So that's one of

19    the items that this individual, Mr. Perez Gonzalez, possessed,

20    that backup CD.

21         In addition, the way this case was initiated, a typical

22    law enforcement investigation over the Ares peer-to-peer

23    network.  And during the course of the law enforcement

24    undercover investigation, the defendant distributed a 23-minute

25    video that contained images of Vicky, and that's -- that video

1    is actually in the PSI, it's listed by its shaw value.

2           And I'm looking at docket entry 140, paragraph four,

3    subparagraph B, and it describes a 23-minute-and-33-second

4    video depicting -- and this is taken from the language of the

5    search warrant, but Ms. Medina will testify -- this is a video

6    that depicts Vicky engaging in oral, vaginal and anal

7    intercourse with an adult male.  So he distributed that.

8           He also possessed images on two of the videos on the

9    backup CD, and there was also one -- I'm sorry -- five videos

10   that depicted sexual explicit conduct with Vicky that was on

11   the laptop, so both -- for both possession counts, Counts 4 and

12   5, he had videos that contained sexual explicit images of

13   Vicky -- two on the CD, five on the laptop, and those are

14   referred to, at least in part, in paragraphs 22 and 23 -- I'm

15   sorry, they're referred to in whole in paragraphs 22 and 23

16   with regard to the number of videos.

17          And you'll see paragraph 22, subparagraph G states that

18   there are five such videos, and that's in reference to the

19   laptop, which was, I believe, Count 4; and then paragraph 23

20   states that there were three such videos.

21          Our review is that there were two such videos and that

22   would be the proffer of Ms. Medina on the Memorex CD that

23   Special Agent Finley testified about as well, and I believe was

24   the subject of Count 5.

25          In addition -- and it was Government's Exhibit 15 at

1    the trial -- and it's located on the docket, because now we

2    have to upload our exhibits.

3              THE COURT:  Yes.

4              MR. KOBRINSKI:  It's located at the docket -- at docket

5    entry 134-14, so Government Exhibit 15 is located at 134-14,

6    and it's a 51-page exhibit where a number of files that were

7    downloaded from the defendant's computer over Ares by other

8    Ares' users, not necessarily law enforcement.

9              Now, these files weren't recovered and so we haven't

10   had an opportunity to review those images from the 51 pages of

11   files, but even on the first page you'll see that one of the

12   first files that -- and there was testimony to this as well --

13   that these were shared files, shared from the defendant's Ares

14   account on his mini laptop, one of the -- on the first page,

15   it's a file titled -- and I apologize because of the subject

16   matter -- "10 years old Vicky anal four," and then the artist

17   is "pedo."

18             And if you go through what other files he shared, what

19   he distributed, what he made available on his Ares network,

20   there's a number of other files that indicate that the subject

21   matter concerned this particular victim.

22             The strongest case, though, is just the actual

23   convicted offense conduct, because this shared file is an

24   indication of what he was doing, and for the convicted offense

25   conduct that I have already set forth shows a causal

1    connection.

2         THE COURT:  All right.  So, basically, your proffer has

3    been that the evidence adduced against the defendant at trial

4    includes videos of Vicky and you have pointed out the various

5    sources of that evidence in the record.

6         MR. KOBRINSKI:  Exactly -- videos that he received,

7    videos that he distributed, and videos that he possessed -- not

8    just -- and one of the Paroline factors is to determine the

9    nature of what the defendant's conduct was.  Here, it wasn't

10   simple possession, it was more than just that.

11        THE COURT:  All right.  And then the evidence for

12   distribution is this Exhibit Number 15 from trial?

13        MR. KOBRINSKI:  That's part of it.  And then, in

14   addition, what was in paragraph 4B of the PSI was a file that

15   was downloaded by an undercover agent, and that was a 23-minute

16   video -- 23 minutes and a little bit more video that depicted

17   Vicky and that was also downloaded by law enforcement.

18        THE COURT:  All right.  Hold on a second.

19        And the Exhibit 15 is docket entry 134, number 15;

20   correct?

21        MR. KOBRINSKI:  Actually, I don't know why the

22   numbering came this way.  It's possible because they were

23   nondocumentary evidence, but it's 134-14.

24        THE COURT:  Oh, yes.  134-14 is Exhibit 15.

25        MR. KOBRINSKI:  Correct, Your Honor.

1          THE COURT:  All right.  So that is the evidence of

2     distribution.  And then, of course, there is evidence of

3     receipt and possession, because to distribute you have to have

4     received and possessed.

5          MR. KOBRINSKI:  In addition to that -- yes, Your Honor.

6          But in addition to that, specifically for the

7     possession, five files were recovered from the laptop that was

8     located under a bed during the search warrant.

9          THE COURT:  Yes.

10         MR. KOBRINSKI:  Five video files.  And there were two

11    video files that were located on a Memorex CD that was located

12    in his bedroom that was also recovered during the

13    search warrant.

14         THE COURT:  All right.  And those exhibits are?

15         MR. KOBRINSKI:  And those exhibits -- I don't have the

16    exhibit list handy.  They are -- they're listed as the laptop

17    and the Memorex CD in the exhibit list.  I could supplement

18    with a filing if this Court requires that or --

19         THE COURT:  Well, so that I can make exhibit

20    references.

21         MR. KOBRINSKI:  Sure.

22         THE COURT:  Let me see.  There must have been an

23    exhibit list.

24         MR. KOBRINSKI:  There was, Your Honor.  Unfortunately,

25    I wasn't under the impression I was going to cover this hearing

1    so I didn't have an opportunity to print out all of the

2    materials this morning.

3            THE COURT:  All right.  But there is an exhibit from

4    trial listing the five files from the laptop?

5            MR. KOBRINSKI:  It doesn't list those specific five

6    files, and so that would be in part, although, it is covered in

7    part of the trial testimony.  It would also be Special Agent

8    Medina's testimony that there were five files on the mini

9    laptop and the exhibit list specifically lists a mini laptop.

10           THE COURT:  All right.

11           MR. KOBRINSKI:  And then, likewise, Special Agent

12   Medina's testimony would be that there were two files on the

13   Memorex CD, and that Memorex CD is also listed as a trial

14   exhibit.

15           THE COURT:  I see.

16           MR. KOBRINSKI:  And both of those devices, as well, are

17   actually specified in the indictment, in Counts 4 and 5,

18   there's an allegation regarding the possession of child

19   pornography and it specified about what matter was found on

20   those two devices.

21           THE COURT:  All right.  And those are Counts --

22           MR. KOBRINSKI:  Four and 5.

23           THE COURT:  -- 4 and 5, and he was found guilty of

24   those counts?

25           MR. KOBRINSKI:  Yes, Your Honor.

1          THE COURT:  All right.  So you covered the causal

2    connection factor, all right.

3          MR. KOBRINSKI:  And so I don't know if Ms. Moon has any

4    cross-examination of the agent.

5          THE COURT:  Ms. Moon, would you like to cross-examine

6    Agent Medina?

7          MS. MOON:  Yes, Your Honor.

8          THE COURT:  Please take the stand.

9          COURTROOM DEPUTY:  Raise your right hand.

10         Do you solemnly swear that the testimony which you're

11   about to give in this case before this Court will be the truth,

12   the whole truth, and nothing but the truth, so help you God?

13         THE WITNESS:  I do.

14         COURTROOM DEPUTY:  You may be seated.  Please state

15   your name for the record and spell your last name.

16         THE WITNESS:  Chinelle Medina, M-E-D-I-N-A.

17         MS. MOON:  May I proceed, Your Honor?

18         THE COURT:  Yes.

19         MS. MOON:  Thank you.

20                        CROSS-EXAMINATION

21   BY MS. MOON:

22   Q.  Agent Medina, what was your role in this investigation?

23   A.  I was the co-case agent.

24   Q.  And so did you have an opportunity to view the videos that

25   Mr. Kobrinski made reference to?

1    A.   Yes.

2    Q.   So have you personally confirmed that the video that

3    Mr. Kobrinski indicates has a shaw value that's referenced in

4    docket entry 140, at paragraph 4B, as reviewing oral, vaginal

5    and anal child pornography of Vicky as an identified victim?

6    A.   Yes.

7    Q.   And then as to the two videos that were on the CD, did you

8    have an opportunity to review those?

9    A.   Yes.

10   Q.   And did you personally confirm that they contained images

11   of Vicky?

12   A.   Yes.

13   Q.   And then as to the videos -- the five videos on the laptop,

14   did you personally view those?

15   A.   Yes.

16   Q.   And did you personally confirm that they contained images

17   of Vicky?

18   A.   Yes.

19           MS. MOON:  Nothing further, Your Honor.

20           THE COURT:  All right.  Any redirect?

21           MR. KOBRINSKI:  No, Your Honor.  Thank you.

22           THE COURT:  All right.  Thank you very much, Agent

23   Medina.

24           (Witness excused.)

25           THE COURT:  All right.

1            MR. KOBRINSKI:  Now, what Paroline also requires is

2    that defendants are not held liable for the full restitution

3    amount necessarily, but what they have to be liable for is the

4    consequence and gravity of their own conduct, but that the

5    amount shouldn't be a nominal amount.

6            Now, what the victims have submitted as their request

7    is supported in ample documentation.  I'm not going to

8    elaborate upon all of it, but I would just note for the record

9    the provisions of the pertinent mandatory restitution

10   paragraph, which is at 18 USC Section 2259, covers the victim's

11   losses, which they've requested.

12           And so paragraph B3 of that section indicates victim's

13   losses includes any costs incurred by a victim for medical

14   services related to the psychiatric and psychological care, and

15   there's documentation that this victim has suffered substantial

16   costs in that regard.

17           And also in the other regard, so subparagraph B,

18   physical and occupational therapy; subsection D is lost income;

19   and subsection E is attorneys fees.  And here the amount they

20   have requested is reasonable, it's a small fraction of what the

21   overall -- in fact, they've asked for 30,000 for the other

22   types of losses and 2,500 for attorneys fees.  But Vicky's

23   overall losses are substantially more than that.

24           So the question's for this Court, when making its

25   recommendation for Judge Ungaro, is whether that amount -- the

1    32,500 -- is grounded in the defendant's misconduct and is

2    not -- is more than a token or nominal amount, but is not going

3    to necessarily be any sort of windfall or not be proportional.

4              And the Government's position is that, while the Court

5    could potentially fashion a different amount, that that number

6    is grounded in substantial documentation, and it's certainly

7    grounded in causal connection, and this is not -- I've seen

8    other upholding awards of 5,000 or 10,000 in simple possession

9    cases, and that's not what was done here.

10             There was distribution and particularly a

11   23-minute-and-30-second video, which is a very substantial

12   length of a video to be distributing, and that's just the one

13   that the agent downloaded, let alone what the shared file

14   indicates what else was being distributed by the defendant.

15   That's Government's 15.

16             And so the Government's position is that what the

17   victim's request being made here is a reasonable one under the

18   circumstances and is supported in the statute and Paroline case

19   law, which kind of gives the Court guidance in terms of how to

20   implement a reasonable restitution figure for cases such as

21   these, why restitution is, in fact, mandatory.

22             THE COURT:  All right.  And you're stating that this is

23   only a portion of the losses incurred by Vicky, and is there a

24   formula by which this requested amount was computed as a

25   percentage of the total losses or what is the -- what is the

1    numerical factor supporting that?

2         MR. KOBRINSKI:  Sure.  And just a moment, Your Honor.

3    So what the -- and again, we received this submission from the

4    victim and oftentimes we will kind of go back and seek

5    additional justification, but I think the documentation here is

6    sufficiently thorough and grounded in the facts of this case,

7    that the amount they requested is reasonable, and I referred to

8    what's been appended to the sealed filing as Exhibit 11 --

9         THE COURT:  Right.

10        MR. KOBRINSKI:  -- where they reference the proper

11   amount of restitution and --

12        THE COURT:  Let me go there.  Okay.  It's not here, so

13   I'm having a hard time finding it.

14        MS. MOON:  It's the case law at the end, Your Honor.

15        MR. KOBRINSKI:  Just to be clear, it doesn't directly

16   address Your Honor's questions, in terms of if there's a

17   specific formula, but it shows the rationale underlying what

18   they mean by the basis for the request.

19        THE COURT:  Okay, I have Exhibit 11.

20        MR. KOBRINSKI:  And I'm looking at page eight of that

21   exhibit, just as -- again, more illustrative than any sort

22   of -- it's not a direct response to Your Honor's inquiry.

23        THE COURT:  Was this a brief submitted in another case?

24        MR. KOBRINSKI:  Yes, Your Honor.

25        THE COURT:  And what was the amount requested there?

1          MR. KOBRINSKI:  I believe the restitution awarded was

2     15,500, and there were two victims in the case.

3          In terms of the amount requested, I --

4          THE COURT:  Well, I see here, at page 14, 11,000 to

5     Cindy and 15,500 to Vicky.

6          MR. KOBRINSKI:  Yes, Your Honor.

7          THE COURT:  So this is in the McIntosh case -- I'm

8     sorry -- in the Reynolds case.

9          And then there's a McIntosh memorandum opinion.  There

10    they were seeking 25,000, and the Court determined that the

11    award should be 14,500.

12         Is there any statutory amount directed on a third

13    video, racial or anything like that?

14         MR. KOBRINSKI:  I'm not familiar with that, Your Honor.

15    I'm not aware of that.

16         THE COURT:  Let's see, Reynolds, 15,500 for 19 images

17    and no videos; where no evidence was given of how many images,

18    2,000 for one video, 5,000 for one video.  This one in McIntosh

19    seems to be a re-calculation of what prior awards have been.

20         I mean, obviously, you've provided me with guidance,

21    Mr. Kobrinski, on the causal connection, and so on, but somehow

22    the amount has to be tethered to the particular facts of the

23    case.

24         MR. KOBRINSKI:  Yes, Your Honor.

25         I would note that for the particular facts of this case

1    and on the brief in support of restitution claim, with regard

2    to the amount requested of attorneys fees, that's based upon

3    the expenditure of $1,750 for five hours of specific time

4    researching this offense and working on this case in the

5    preparation of this submission and communication with the

6    victim.

7         But then, in addition -- so that's the first $1750 of

8    the $2,500 request.  There's an additional $750 requested for

9    generalized time spent on the representation of the victim and

10   her family members to understand the nature of the ongoing

11   challenges she faces due to the trafficking of her images, and

12   then also more general consultation with experts, time spent in

13   maintaining familiarity with the developing case law and other

14   requests.

15        So, basically, 1750 is directly on this case and

16   another 750 is, again, necessary consultation, but keeping

17   apprised of the state of the law and also other developments in

18   this field.

19        So that's -- that formula is specifically provided.

20        And then, also, in terms of the remainder of the

21   submission, there's notation that her actual losses is

22   estimated to be well over one million dollars.  It's

23   $1,085,718.09, and that she's received 581 -- defendant told me

24   some payment.

25        But again, what 2259 directs is that the Court should

```
 1    not necessarily consider the other sources.  The Court may not

 2    decline to issue a restitution order -- this is under B4(b) --

 3    based on the fact that the victim has or is entitled to receive

 4    compensation for his or her injuries from proceeds of insurance

 5    or any other source.  Now, of course, it needs to be balanced,

 6    again, with the causal connection of this defendant and it

 7    should be replaced.

 8              THE COURT:  Well, grounded in conduct, it seems to me,

 9    that there should be some proportionality between what occurred

10    here and what the award would be, and that's what I was seeking

11    some guidance on --

12              MR. KOBRINSKI:  Yes, Your Honor.

13              THE COURT: -- but you do not seem to be putting your

14    finger on that.

15              MR. KOBRINSKI:  I do think that if you just compare

16    with the Reynolds, where the award you referenced was, I

17    believe, 15,000, and it referenced 19 images but no videos, the

18    misconduct here is substantially more.

19              It's not just 19 images that were distributed, and it's

20    videos -- and it's not just images, it was videos that were

21    distributed.  And the guidelines -- as a rough approximation --

22    physically attribute to 75 images per video, and that's, I

23    think, a reasonable estimate for guideline purposes.

24              But what's of note also is that there's a basis of N

25    upward departure if a video exceeds five minutes in length; and
```

1    here, the video more than quadruples that.  So I think that the

2    notion that if we're going to use that as a comparator, this is

3    substantially more aggravating than that case where the 15,000

4    was awarded.

5           THE COURT:  All right.  Any response, Ms. Moon?

6           MS. MOON:  Oh, yes, Your Honor.

7           THE COURT:  All right.

8           MS. MOON:  First of all, I would direct Your Honor's

9    attention to the Paroline case, specifically where the Court

10   notes that where it can be shown both that the defendant

11   possessed a victim's images and that a victim has outstanding

12   losses caused by the continuing trafficking in those images,

13   then it is the defendant's relative role in the causal process

14   that underlies the victim's losses.

15          Here, Mr. Kobrinski has been discussing the Paroline

16   factors, and the Supreme Court suggested that after the Court

17   establishes proximate cause, the Court is then to weigh those

18   factors in determining the relative causal significance of the

19   defendant's conduct as to the victim's total losses.

20          In this matter, the Government's proffer or its filing

21   indicates that as to the number of criminal defendants found to

22   have contributed to the victim's general losses, the Government

23   says it is 769, but I found a case --

24          THE COURT:  I'm sorry, 769 defendants?

25          MS. MOON:  Correct -- who have been ordered to pay

1    restitution to Vicky.

2            THE COURT:  Where does the Government say that?  I'm

3    sorry.

4            MS. MOON:  It is in their filing -- give me a moment,

5    I'll find the precise page -- where the Paroline factors are

6    discussed by the Government on, I believe, it's page 12.

7            THE COURT:  Oh, I see it, in number of offenders --

8            MS. MOON:  Yes.

9            THE COURT:  -- Vicky has received 769 prior restitution

10   orders of which 581 defendants have actually made some payment.

11           MS. MOON:  Correct, that is what I'm making reference

12   to.

13           THE COURT:  All right.

14           MS. MOON:  May I pass up a case for Your Honor's

15   perusal?

16           THE COURT:  Yes, go right ahead.  Do you want to share

17   a copy?

18           MS. MOON:  I am giving a copy to Mr. Kobrinski as we

19   speak.  I've provided counsel and the Court with the case of

20   United States versus Miltier 2016 U.S. District, Lexis, 159606,

21   decided in the Eastern District of Virginia, on November 17th,

22   2016.

23           And if Your Honor will look at the first paragraph on

24   the second page, it references -- four lines from the bottom of

25   that first paragraph -- as of Ms. Hepburn's October 12, 2016,

1    letter, Vicky has received $858,093.85 from 830 orders of

2    restitution.  Thus, Vicky still seeks $337,854.11.

3              So, as of November 17th, 2016, Vicky had -- 830

4    defendants had been ordered to pay Vicky restitution, not 769,

5    as referenced in the Government's pleading.

6              THE COURT:  All right.

7              MS. MOON:  As to the second Paroline factor, a

8    reasonable number of future offenders, some courts have doubled

9    the known number of offenders who have been ordered to pay

10   restitution and some courts have found that to be too

11   speculative of a factor so they did not consider it.

12             The third Paroline factor, reasonably reliable estimate

13   of a broader number of offenders, the Government says in its

14   pleading that the viral spread is unceasing and uncontrollable.

15             There are some courts who have found that factor also

16   to be too speculative and have not considered it.

17             The fourth factor, whether the defendant reproduced or

18   distributed images of the victim.  In their pleading, the

19   Government says Vicky is not informed as to whether the

20   distribution of child sex abuse images committed by the

21   defendant specifically included any of her images.

22             The Government has also presented --

23             THE COURT:  I'm sorry, where are you?  Are you reading

24   from the case that you handed up or are you reading from --

25             MS. MOON:  No.  I'm reading from the Government's

1   submission.

2          THE COURT:  Okay.  Can you point me to the page?

3          MS. MOON:  Page 17, number of images of Vicky in this

4   case.

5          THE COURT:  Hold on for a second.  I want to follow

6   along.

7          MS. MOON:  Yes, ma'am.  Page 17, subsection A3, number

8   of images of Vicky in this case.

9          THE COURT:  Are you talking about the brief in support

10   of restitution claim?

11          MS. MOON:  Yes, ma'am.

12          THE COURT:  Page 17 --

13          MS. MOON:  Page 12 of 17.

14          THE COURT:  All right.  Page 12, subsection?

15          MS. MOON:  A triple I.

16          THE COURT:  A triple I.  Number of images of Vicky in

17   this case, Vicky is not informed at this time of the number of

18   her images, in both this case --

19          MS. MOON:  Correct.

20          THE COURT:  -- but I found Mr. Kobrinski --

21          MS. MOON:  But the Government had submitted that at

22   trial there were eight videos.  So I'm pointing out that

23   contradiction in their presentation to Your Honor.

24          THE COURT:  All right.  But we have now, from the

25   proffer and the cross-examination of the agent, that there were

1    two videos on CD and five on the laptop.

2           MS. MOON:  And one downloaded from the case agent -- or

3    uploaded.

4           THE COURT:  The 23-minute one; right?

5           MS. MOON:  Correct.  That's right.

6           THE COURT:  So that's a total of six --

7           MS. MOON:  That's a total of eight.

8           THE COURT:  All right.  Two on CD -- eight, two on CD,

9    five on laptop, and one downloaded?

10          MS. MOON:  Yes.  I simply point out a contradiction, as

11   it goes to the Government meeting its burden, Your Honor.

12          THE COURT:  All right.  But they have now proffered the

13   evidence at this hearing?

14          MS. MOON:  That is correct.

15          THE COURT:  All right.  I'm following you now,

16   Ms. Moon.  Thank you.

17          MS. MOON:  Okay, no problem.  Back to the Paroline

18   factors.  The fourth is whether the defendant reproduced or

19   distributed images of the victim.

20          Again, there is a contradiction in the Government's

21   presentation to the Court.  Once again, on page 12 of 17 of the

22   brief in support of restitution claim, subsection A4 --

23          THE COURT:  Yes.

24          MS. MOON:  -- Vicky is not informed as to whether the

25   distribution of child sex abuse images committed by the

1    defendant specifically included any of her images.  However, as

2    distribution typically occurs via passive means, it should be

3    assumed that her images were, in fact, distributed.

4          THE COURT:  Okay.  But again, we now have evidence from

5    the agent that -- you cross-examined her and she said that she

6    had identified Vicky on each one of these, the two on the CD,

7    the five on the laptop, and the one that was downloaded.

8          MS. MOON:  As to the distribution, I believe, the

9    pertinent testimony from the agent was as to the one

10   downloaded -- or uploaded by law enforcement.

11         THE COURT:  All right.

12         MS. MOON:  As to the fifth Paroline factor, whether the

13   defendant had any connection to the initial production of

14   images, the Government has conceded that the defendant had no

15   part in the production of images of Vicky's abuse.

16         THE COURT:  All right.

17         MS. MOON:  As to the sixth factor, how many images of

18   the victim the defendant possessed.

19         Again, there is a contradiction in the pleading on page

20   12 of 17, the Government has presented to the Court that Vicky

21   is not informed at this time of the number of her images

22   involved in this case, and then we have the contradictory

23   testimony from the case agent today.

24         THE COURT:  I'm sorry, additional factor, nature of the

25   images?  I'm following down on page 12.

1           MS. MOON:  No.  We're talking about the sixth Paroline

2     factor, how many images of victim the defendant possessed.

3           The seventh factor of Paroline is other relative

4     factors to the defendant's relative causal role -- relevant

5     factors to the defendant's relevant causal role.

6           THE COURT:  Okay, where are you reading from the

7     Government's submission?  I'm trying to keep track here.

8           MS. MOON:  I'm not reading from the Government's

9     submission quite yet, Judge.  I'm going through the Paroline

10    factors that the Court is to consider.

11          THE COURT:  All right.  And that is the number of --

12          MS. MOON:  It's the other relevant factors to the

13    defendant's relative causal role, so it's the catch-all factor

14    at the end of the Paroline for the Court's consideration.

15          THE COURT:  All right.

16          MS. MOON:  And there it is the nature of the images.

17    And in the Government's submission on Page 12 of 17, subsection

18    seven, they did indicate an additional factor as to the nature

19    of the images being sadistic in this case.

20          THE COURT:  Subsection six, additional factor, nature

21    of images?

22          MS. MOON:  Correct, Your Honor.

23          THE COURT:  All right.  So that is the additional

24    factor, nature of images?

25          MS. MOON:  Yes, Your Honor.

```
1              THE COURT:  All right.

2              MS. MOON:  So, as to the Government's submission

3    regarding the exhibits and materials that were submitted in

4    support of the claim for the $30,000 -- I'm sorry -- $32,500

5    restitution figure, 30,000 of which is general restitution,

6    2,500 of which is as to the attorneys fees, the defendant would

7    draw the Court's attention specifically to Exhibit 3.

8              THE COURT:  Hold on.  I need to find that because,

9    again, there's no counts here.

10             Can you tell me what that is so I can kind of --

11             MS. MOON:  Exhibit 3 is a submission by Randall L.

12   Greene, Ph.D., a clinical psychologist.

13             THE COURT:  All right.

14             MS. MOON:  Unfortunately, I don't have page numbers --

15   oh, I'm sorry -- it says page 18 in the upper left-hand corner.

16             THE COURT:  Let's see, I have Exhibit 1 -- I just need

17   to work my way through this.  Exhibit 2.

18             Exhibit 3, all right, I'm at Exhibit 3, and now you're

19   pointing me to?

20             MS. MOON:  Page 18.

21             THE COURT:  Page 18, at the top.

22             Page 18, there seems to be a chart on that page?

23             MS. MOON:  Yes, Your Honor.

24             THE COURT:  All right.

25             MS. MOON:  It is Mr. Perez Gonzalez's position that the
```

1    costs that have occurred between 2009 and 2017 should not be

2    attributed to him.  So it is his position that instead of

3    $113,600, that he should only be held responsible for $64,275

4    of that future counseling cost.

5             MR. KOBRINSKI:  I'm sorry, Your Honor.

6             THE COURT:  And the grounds for that is?

7             MR. KOBRINSKI:  Thank you.  I just wanted to clarify.

8             MS. MOON:  I've had this discussion with him many times

9    over.  It is his position that Vicky has already obtained that

10   counseling, already received funds from the 830 other

11   restitution orders towards that counseling, so it is his

12   position that that particular amount should not be attributed

13   to him.

14            THE COURT:  Well, how do you know that the money she

15   received has been apportioned to him?

16            MS. MOON:  I didn't ask him that question.  I can't

17   imagine that he would know, Your Honor.  That is simply his

18   position.  I'm relaying his position to the Court.

19            MR. KOBRINSKI:  Your Honor, on this -- and I hate to

20   interrupt -- on this very limited point, I do think this is

21   material, maybe Ms. Moon would want to incorporate this.

22            A fact adduced at trial also was that on that backup

23   CD, it dated to 2009.  So he began possessing images of Vicky

24   at least as early as 2009, so I just really don't think it

25   doesn't hold any water; more so than what you mentioned, but in

1    addition to those reasons as well.

2         THE COURT:  Okay.  All right.

3         MS. MOON:  Mr. Perez Gonzalez holds the same position

4    as to Exhibit 14 -- I'm sorry -- make that Exhibit 4, I

5    believe -- yes, Exhibit 4.  Let me make sure we're all on the

6    same page here.  Exhibit 4 is Dr. Greene's CD.

7         Your Honor, we'll turn our attention to Exhibit 5,

8    Dr. Meryl Cohen's report.

9         THE COURT:  So we did Exhibit 3, page 18.

10        Now we're doing Exhibit 5.

11        MS. MOON:  Yes, Your Honor.

12        THE COURT:  Let me find that.

13        MS. MOON:  Exhibit 5, page four.

14        THE COURT:  All right.  I found Exhibit 5.

15        MS. MOON:  It is the same argument, Your Honor.  You'll

16   notice that in the chart there, the costs are attributed to

17   educational and vocational counseling that occurred.  That was

18   supposed to end this year, in 2017.

19        So Mr. Perez Gonzalez takes the same position that the

20   educational and vocational counseling has already occurred and

21   that Vicky had already received 830 restitution orders paying

22   for that particular cost.

23        THE COURT:  All right.

24        MS. MOON:  Now, as to the attorneys fees, which the

25   documentation submitted by the Government in support of that

1   begins at Exhibit 10.

2           THE COURT:  Right.  Mr. Kobrinski went through that,

3   how that is figured.

4           MS. MOON:  Yes.  That came from the Government's brief

5   in support of the restitution claim.  Unfortunately, the

6   documentation submitted by the attorney does not support that.

7           THE COURT:  All right.

8           MS. MOON:  The documentation submitted by the attorney

9   is a declaration of victim's counsel in support of restitution

10  that makes absolutely no reference to time being spent on this

11  case, in particular.

12          And per Exhibit 1, details the $92,371 in out-of-pocket

13  expenses, so there is no supporting documentation for her claim

14  of five hours spent on this case, in particular, which, as the

15  Court has already stated, it has to be related to this

16  particular defendant's conduct.

17          THE COURT:  Are you saying that in this declaration

18  there's no indication of how much attorney time has been spent?

19          MS. MOON:  On this case, no.

20          THE COURT:  On any case?

21          MS. MOON:  On this case.  It has to be time to this

22  defendant's conduct.  In fact, I believe the declaration was

23  dated in 2014, which was before the Government even brought

24  this case.

25          THE COURT:  Where does the declaration state how much

1   time this attorney has spent?

2         You said the Exhibit 1 is out-of-pocket expenses.

3         MS. MOON:  Correct.

4         THE COURT:  Is there any kind of a time record attached

5   to this?

6         MS. MOON:  No, there isn't; that's my point,

7   Your Honor.

8         THE COURT:  So this declaration is only supporting

9   out-of-pocket expenses.  There's nothing in the narrative that

10  says how much time the attorney has spent?

11        MS. MOON:  Not on this case, no.

12        THE COURT:  No, no.  You keep saying not on this case,

13  and I am asking you --

14        MS. MOON:  No, there isn't, actually.

15        THE COURT:  -- what she did.

16        MS. MOON:  On paragraph 16, Ms. Hepburn, on the 10th of

17  May, 2014, said:

18        My standard fee when billed at an hourly rate is $350.

19  This is consistent with the rate charged by other attorneys in

20  the Seattle area of my experience and tenure.  I have been

21  awarded fees at this hourly rate by a number of state and

22  federal courts, at a rate of $350 per hour, 1400 hours amounts

23  to $490,000.

24        THE COURT:  After 15, she said she has spent 1400 hours

25  in direct representation of her client through May 7th, 2014.

1          MS. MOON:  Which is not related to this defendant's

2    conduct.  He hadn't even been charged on May 7th of 2014.

3          THE COURT:  But Mr. Kobrinski has said that some of

4    these videos date back to 2009.

5          MR. KOBRINSKI:  That's right, Your Honor.  What the

6    defendant possessed on the Memorex CD he acquired in 2009 or

7    earlier.

8          THE COURT:  All right.  Anything else?

9          MS. MOON:  Yes.  As to the calculation, the case that

10   I've already presented to the Court, U.S. -v- Miltier --

11         THE COURT:  Yes.

12         MS. MOON:  -- used a formula of the remaining

13   restitution owed to the victim divided by the number of

14   restitution orders.

15         According to the Government's submission, the total

16   amount of losses is $1,085,718.09.

17         As of November 17th, 2016, when the Miltier case was

18   done, Vicky had received $858,093.85.

19         So there is an outstanding balance of $227,624.24.

20         Some courts have calculated restitution by dividing the

21   total loss by the number of restitution orders.  Again, as of

22   November 17th, 2016, there were 830 orders, according to

23   Ms. Hepburn.

24         The Government's own submission to the Court, U.S.

25   versus McIntosh, the Court used the calculation of the number

1    of images of the victim that the defendant possessed,

2    multiplied by $1.96 per image.

3            In the McIntosh case there were 98 videos, which,

4    multiplying by 75, according to the sentencing guidelines,

5    yielded a number in excess of $7,000.  Here --

6            THE COURT:  I'm sorry, say again, who is it you

7    referenced the sentencing?

8            MS. MOON:  The McIntosh case --

9            THE COURT:  Yes.

10           MS. MOON:  -- submitted to the Court by the

11   Government --

12           THE COURT:  Yes, I'm there.

13           MS. MOON:  -- the calculations included -- I believe

14   the Court said it was $14,500 --

15           THE COURT:  Right.  That's what's --

16           MS. MOON:  -- was awarded in that particular case.  I'm

17   sorry, is that Reynolds -- or is that McIntosh?  Let's see.

18           THE COURT:  McIntosh was --

19           MS. MOON:  14,500 was rewarded.  25,000 was requested.

20           THE COURT:  Right.  And you're saying -- tell me again

21   what you said that the computation there was.

22           MS. MOON:  It came out to be a $1.96 per image.  I'm

23   looking for the case that referenced that.  I believe it was

24   the Miltier case that I handed up to the Court.

25           MR. KOBRINSKI:  It's in the footnote two of the case

1    that you handed up.

2              THE COURT:  It's on here.

3              MS. MOON:  Yes.  The Miltier case from November 17th of

4    2016, in footnote two, on page three, the Court indicates:

5              For the purposes of sentencing, each video is assumed

6    to contain 75 images.  Therefore, in McIntosh, 98 videos times

7    75 images equals 7,350 images.  When adding 51 images, this

8    results in 7,401 images, that rate is $1.96 per image.

9              THE COURT:  So the Miltier case said, okay, I'm going

10   to take the McIntosh award of 14,500, divide it by the number

11   of images, come up to $1.96?

12             MS. MOON:  That is correct.

13             THE COURT:  And then that finds 75 -- and then what was

14   the award in Miltier?

15             MS. MOON:  The award in the Miltier case was, I

16   believe, $407.05.  That's indicated in the final paragraph on

17   page five.

18             THE COURT:  All right.

19             MS. MOON:  So if the Court were to use the calculation

20   that was used in McIntosh, the Government has proffered and

21   Agent Medina has confirmed on cross-examination that there were

22   eight videos of Vicky tied to the defendant's conduct in this

23   case, at 75 images per video, where it's 600 images, if you

24   round up to $2 for 600 images, it's Mr. Perez Gonzalez's

25   position that the restitution should not be in excess of $1200

1   in this case.

2          THE COURT:  Now, is it possible that a 23-minute video

3   only has 75 images?

4          MS. MOON:  Videos are attributed to 75 images under the

5   sentencing guidelines.

6          THE COURT:  I understand that.

7          MS. MOON:  As Mr. Kobrinski indicated, when it was over

8   five minutes, there can be an increase or a bump in the

9   guidelines, but videos are attributed to 75 images.

10         THE COURT:  That's under the sentencing guidelines

11   statute.

12         MS. MOON:  That is correct.

13         THE COURT:  That doesn't necessarily go into the

14   restitution calculation; right?

15         MS. MOON:  No, Your Honor.  I am simply providing the

16   Court with the possible means of calculating the restitution in

17   this matter and pointing out to Court --

18         THE COURT:  I understand that.

19         MS. MOON:  -- that even the Government's own

20   submission, the U.S. versus McIntosh case, used a calculation

21   of $1.96 per image.

22         THE COURT:  But what we don't know is whether McIntosh

23   involved this 23-minute video or not; correct?

24         MS. MOON:  I have no idea how long the videos were in

25   McIntosh.  I submitted the Miltier case for Your Honor to

1   consider because the Miltier case also used the McIntosh

2   calculation, and even in Miltier the restitution was only

3   $407.05.

4          THE COURT:  All right.  Thank you.

5          You have been very helpful this morning.

6          MS. MOON:  Thank you, Your Honor.

7          THE COURT:  Anything else?

8          MR. KOBRINSKI:  May I briefly be heard, Your Honor?

9          THE COURT:  Yes.

10          MR. KOBRINSKI:  The task here is difficult and the

11   burden is the Government's.  But the task, again, should be

12   considered, the Government has a burden that the preponderance

13   of the evidence and it's a reasonable estimate.

14          And I don't know that all of the suggestions that

15   Ms. Moon put with regard to discrepancies between the

16   submission and the testimony today would somehow diminish what

17   this Court's -- diminish what the defendant had in his

18   possession, that what's put forth is reasonable, and what is

19   before it is grounded in sufficient evidence that is

20   established by preponderance the defendant's burden here.

21          First, I think, and the easiest example is the

22   attorneys fees is an issue, because Ms. Hepburn submitted as an

23   exhibit, a previous declaration she conducted in 2014, which is

24   actually five years after when the defendant started his

25   possession -- or the latest date that he started his possession

1    of the Vicky series.

2            The suggestion is, well, that's not tied to this case.

3            Well, it's not reasonable to suggest she didn't spend

4    any time on this case.  And she said her hourly rate, it was

5    350 for an hour, but she supplemented and put in for 250 an

6    hour for the five hours, and that's the basis for the 1750.

7            And the question for this Court is whether that's a

8    reasonable estimate; and if it's not a reasonable estimate, I

9    don't think the Court should then suggest, well, since that

10   estimate is not reasonable, therefore, we shouldn't award

11   anything.  It can find a middle ground as long as it's

12   predicated on submissions into evidence.

13           And so the submission which the Government prepared in

14   the sealed filing was derived from Ms. Hepburn and from her law

15   firm, so it's obviously -- there's circumstantial evidence that

16   they spent significant time because they prepared a substantial

17   packet for this case.

18           THE COURT:  All right.  And you are going to give me

19   those computations, and those were in exhibit -- which?

20           MR. KOBRINSKI:  Yes.  I believe it was Exhibit 10 and

21   then also in the Government's filing in the paragraph --

22           THE COURT:  Well, Exhibit 10, obviously did not give

23   ist -- that one had 1400 hours.  That was not specific to this

24   case; right?  But you just said --

25           MR. KOBRINSKI:  That's right.

1          THE COURT:  -- that she had five hours for this case?

2          MR. KOBRINSKI:  Yes, and that's based on the

3     representation which we've made in the filing, which we took

4     from Ms. Hepburn that representation that it was five hours,

5     plus additional time based on her general expenditures.

6          And I think the Court can deduce from the

7     circumstantial evidence that that's a reasonable estimate under

8     these circumstances.

9          Now, the defendant suggests $2 per image is reasonable.

10         THE COURT:  I'm sorry, hold on.  Victim's request for

11    attorney's fees is based upon an apportionment of 1750 for time

12    spent directly on the defendant's case of five hours, and that

13    is based on what?

14         Is there a declaration from Ms. Hepburn that she spent

15    five hours on this case?

16         MR. KOBRINSKI:  That declaration is from information,

17    I believe, received by AUSA Ignacio Vazquez who filed this

18    submission, I believe with her substantial assistance.

19         And I think part of that can be bourne out by the fact

20    that the figures which she cited with regard to when the

21    defendant was -- I'm sorry -- how many defendants had been made

22    to pay awards is less than the case that Ms. Moon cited, but

23    the costs associated with the victim's losses was also less.

24         So Ms. Moon had talked about the discrepancy there, in

25    addition.  So I'm looking at page 15 right now with regard to

1   attorneys fees.

2          Now, with regard to that discrepancy between the costs

3   in the Miltier case versus this case, I think what can account

4   for some of that discrepancy is -- the way victims are notified

5   of the losses in the cases is based on law enforcement

6   notifying the National Center For Missing and Exploited

7   Children, who, in turn, notifies those victims who want to be

8   apprised that their images continue to be peddled by people on

9   the internet, and other victims say they don't want to be

10  notified.

11         And then also those who are notified, some submit

12  restitution, and it is very likely that in this case that

13  notification process and, therefore, the figures and accounting

14  for it predated the Miltier case.

15         Now, it doesn't change again that it's a reasonable

16  estimate -- the Government would concede the Court can use the

17  Miltier numbers -- but it's interesting that Ms. Moon only used

18  the Miltier numbers that would be in her advantage, not both of

19  them.

20         THE COURT:  That's right.

21         MR. KOBRINSKI:  Because the victim's losses also

22  increased from the time of our position to the time of the

23  Miltier position, and that's reasonable.

24         THE COURT:  It's a million 195, according to Miltier.

25         MR. KOBRINSKI:  Exactly.

1           THE COURT:  All right.  But I thought I heard you say

2    that the weight that you compute the restitution amount is

3    based on what the defendant grounded in his conduct, as opposed

4    to taking a percentage of what has been awarded.  That doesn't

5    seem to be the approach that the Miltier case court took.

6           They just did a base on some dollar figure per image;

7    correct?

8           MR. KOBRINSKI:  I think McIntosh did more of the dollar

9    figure per image.  The footnote in Miltier, it appears that

10   Miltier really did try to speculate substantially and do the

11   percentage approach.

12          Now, Ms. Moon has conceded that her client agrees that

13   the $2 per image is appropriate, that that would be the outer

14   limit.  And then she says it should be capped at eight videos,

15   which was constitute 600 images.

16          And the Government suggests that that's just not the

17   only approach.  One, that's $1200, plus some reasonable

18   attorneys fees, so there is going to be some award here.

19          But second, if you go through the exhibits -- and I did

20   not do that, perhaps I can do an additional submission -- but

21   the relevant conduct that the defendant committed with regard

22   to Vicky videos far exceeds the eight videos.

23          The shared files in the number of Vicky videos is

24   potentially more.  When the defendant downloaded thousands of

25   videos -- the Government just doesn't have the opportunity and

1    resources, it's a huge number.

2          But now we have one particular video and he's conceding

3    that there's that approach.  That's, I guess, an option.

4          But frankly, I think that -- again, grounded in his

5    conduct, he distributed a 23-minute video.  That should go for

6    more than $2 an image capped at 75 images.

7          Distributing a 23-minute video should cost the

8    defendant more than $147.  And the Government's submission is

9    that while the Court need make a reasonable estimate, in this

10   case, while we have one grounded in what the victim has

11   requested, it could also just potentially double the amount.

12   So instead of $2 per image, for that one that was distributed,

13   it could be $4 an image.

14         But I don't think 75 images is appropriate either.

15         I think the court, if it's going to use a formula,

16   should consider 75 per five minutes, as opposed to 75 for

17   the -- and so when you do 75 for four minutes, that would more

18   than quadruple it.

19         THE COURT:  Seventy-five for five minutes, because

20   that's the number of images in a five-minute video?

21         MR. KOBRINSKI:  Well, typically, the number of images

22   per minute is 30; and then if it's a high-quality video, it

23   often can be 60 images per minute or more.  And so the

24   guidelines is just trying to do rough calculations and rough

25   estimates.

1          THE COURT:  But the guideline says?

2          MR. KOBRINSKI:  Seventy-five per five-minute.

3          THE COURT:  At least the guideline is giving us a

4    number.

5          MR. KOBRINSKI:  Yeah, that's right.

6          THE COURT:  And then the guidelines enhance after five

7    minutes; right?

8          MR. KOBRINSKI:  What it says is that would be the basis

9    for an upward departure because it doesn't fairly encapsulate

10   what actually is comprised by somebody who has a 23-minute or

11   even a 10-minute video.

12         THE COURT:  All right.  So then you're saying if you

13   take that ratio of 75 images for five minutes and then you

14   parade that between three minutes, you're saying that that's

15   one approach?

16         MR. KOBRINSKI:  Yeah, that's one approach, and because

17   it was distribution, I think the value of what he did should

18   also be reflective in the restitution amount.

19         THE COURT:  So sort of do an upward calculation, not

20   what the sentencing guidelines would do?

21         MR. KOBRINSKI:  Yes, Your Honor, at a minimum.

22         THE COURT:  All right.

23         MR. KOBRINSKI:  And again, this is all grounded on

24   McIntosh, whose award was predicated on 51 videos and 98 still

25   images and his award was $14,500.

1          But it's not clear -- it's not clear based on the

2     recitation of this case whether that's McIntosh's specific

3     conduct towards one victim or if that's McIntosh's entire

4     conduct of conviction.

5          Because remember, here, this defendant had a lot more

6     than 51 or 98.  He had hundreds of videos.  It just wasn't

7     that -- they weren't all Vicky.

8          And that's also something that the Court should

9     scrutinize before it adopts too narrowly that what I think is a

10    very minimal approach of $147 for a child pornography video.

11          MS. MOON:  Your Honor, if I may --

12          THE COURT:  Yes, wrap it up.

13          MS. MOON:  -- just a couple points of clarification.

14          THE COURT:  Yes.

15          MS. MOON:  The guidelines does not say 75 images per

16    five minutes.  That is Mr. Kobrinski's suggestion to the Court.

17          THE COURT:  Okay.  What did the guidelines say?

18          MS. MOON:  The guidelines say 75 images per video, and

19    then it allows for an upward departure if the video is in

20    excess of five minutes.

21          THE COURT:  Well, that's the same thing.

22          MS. MOON:  No, it's not, Your Honor.

23          THE COURT:  All right, I understand.

24          MS. MOON:  Okay.

25          THE COURT:  But anyway --

1          MS. MOON:  I just wanted to make that clear.

2          THE COURT:  -- it may not be that -- but I understand

3    it.

4          MS. MOON:  And then the second clarification is that

5    the defendant is not conceding $2 per image.

6          THE COURT:  Yes, the defendant is not conceding

7    anything.

8          MS. MOON:  Our argument submitted by me for the Court's

9    consideration in offering different formulas to use to

10   calculate the restitution is not a concession by Mr. Perez

11   Gonzalez.

12         THE COURT:  I will not take it as a concession,

13   Ms. Moon.

14         MS. MOON:  Thank you, Your Honor.  I appreciate that.

15         THE COURT:  I know that the defendant will not take any

16   stipulation.

17         I presume that the defendant's position is that no

18   restitution should be awarded against him?

19         MS. MOON:  Yes, Your Honor.  Thank you very much.

20         THE COURT:  You're very welcome.

21         Anything else?

22         MR. KOBRINSKI:  No, Your Honor.  Thank you.

23         THE COURT:  All right, thank you very much.

24         I will put all of this into my brain and come up with a

25   report and recommendation to Judge Ungaro.

```
 1          MS. MOON:  Thank you, Your Honor.  May I be excused?

 2          THE COURT:  Yes.

 3          COURT SECURITY OFFICER:  All rise.  Court's adjourned.

 4          (Proceedings concluded at 11:20 a.m.)

 5

 6                    C E R T I F I C A T E

 7

             I hereby certify that the foregoing is an
 8
        accurate transcription of the proceedings in the
 9
        above-entitled matter.
10
        May 25th, 2017         /s/Glenda M. Powers
11      DATE                   GLENDA M. POWERS, RPR, CRR, FPR
                               Official Federal Court Reporter
12                             United States District Court
                               400 North Miami Avenue, 08S33
13                             Miami, Florida 33128

14

15

16

17

18

19

20

21

22

23

24

25
```